IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF an Apple iPhone seized from 1106 Rosalie Drive, Charleston, West Virginia during a search warrant on September 10, 2024 | Case No. 2:24-mj-00162 |

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

I, Jennifer L. King, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the extraction and examination of electronically stored information from one electronic device seized from JASON MINTER (hereinafter "MINTER") by the Metropolitan Drug Enforcement Network (MDENT) during the execution of a search warrant at 1106 Rosalie Drive, Charleston, Kanawha County, West Virginia 25302. The electronic device is more particularly described herein and in Attachment A and includes: 1) a Blue Apple iPhone Cellular telephone, Model A2482, International Mobile Equipment Identity ("IMEI") 358654490579366, assigned telephone number (304) 415-6723. The electronically stored information sought under this warrant is more particularly described herein and in Attachment B. The SUBJECT DEVICE is currently located at the FBI, Charleston Resident Agency, 113 Virginia Street East, Charleston, Kanawha County, West Virginia 25301.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement

officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and authorized to apply for federal search warrants. I have been employed as a Special Agent of the Federal Bureau of Investigation ("FBI") since February 2008, and I am currently assigned to work drug investigations in the Charleston, West Virginia Resident Agency of the Pittsburgh Division. Previously, I was assigned to the Long Island Resident Agency of the New York Division and served as a member of the Long Island Gang Task Force ("LIGTF"). As a member of the LIGTF, I investigated drug trafficking, money laundering, gangs, violent crimes, and other offenses. I have personally participated in over 100 arrests and search warrants and have been an Affiant on numerous federal Title III affidavits. Prior to joining the FBI, I was employed as a police officer with the Clarksville Police Department located in Clarksville, Tennessee and as a chemist with the Drug Enforcement Administration ("DEA") for approximately one year. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses.

3.  During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous recorded conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education, and experience, I have become familiar with (a) the manner by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. Through my training and experience, I have become familiar with: (a) the manner and methods by which illegal drugs are imported and distributed; (b) the methods of payment for such drugs; and (c) the efforts of persons involved in such activities to avoid detection by law enforcement.

5. Based on my training, experience, and conversations with other experienced narcotics investigators, I have gained knowledge in the techniques and methods used by drug traffickers to distribute controlled substances, their use of cellular phones and other electronic communication devices to facilitate their trafficking activity, and their methods used to conceal and launder the proceeds of said activity.

6. Based upon my training and experience, and interviews conducted with defendants, informants, and other witnesses to, or participants in, drug trafficking activity, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs. This includes their use of cellular telephones, Facetime calls, multiple communication applications, computers, tablets, emails, texts, and use of numerical codes and code words to conduct their transactions. In my experience, drug traffickers often obtain cellular telephones in fictitious names and/or the names of other people in an effort to conceal their drug trafficking activities from law enforcement. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and proceeds, the use of their associates and nominees to purchase or to hold title to assets, and the use of offshore accounts.

7. Based on my training and experiences in other investigations, I have reviewed telephone billing records for telephones used by drug traffickers. I know that drug trafficking is often furthered by utilizing multiple cellular phones, multiple insulated contacts, and pre-paid

3

cellular phones, which is also known as compartmentalization. The use of the telephones in this manner is designed to help avoid detection by law enforcement.

8. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by MINTER and others whose identities are either known or unknown, in violation of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances), 843(b)(use of a communication facility to facilitate drug trafficking), and 846 (conspiracy to distribute controlled substances).

9. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation. Summaries of conversations set forth in this affidavit are based on draft transcripts of those conversations.

## PROBABLE CAUSE

10. In July 2022, investigators developed a confidential informant (CI 3166-07-22, hereinafter "CI") who provided information on MINTER in August 2024. The CI agreed to work as an informant for monetary compensation. No promises have been made to the CI. The CI's information has proven to be reliable and has been corroborated by other facts learned in the investigation. The CI has no previous convictions. The information provided by the CI has been corroborated by the audio and video recordings of the CI's controlled fentanyl purchases and officer surveillance. The CI's information has been used in the past to obtain search warrants in other investigations that led to seizures of drugs and arrests. The CI has completed multiple controlled purchases in the past in other investigations and has successfully completed three controlled purchases of suspected fentanyl from MINTER.

11. In August 2024, investigators met with the CI and the CI advised that MINTER was distributing ounces of fentanyl from his residence 1106 Rosalie Drive, Charleston, Kanawha County, West Virginia. The CI had previously purchased fentanyl from MINTER at this residence on several occasions but hasn't spoken with him for a couple months. The CI stated that s/he was purchasing an ounce of fentanyl from MINTER every couple days for $1,000. This continued for several months until the CI accumulated a debt that s/he was unable to pay. The CI stated that s/he would call MINTER on telephone number (304) 410-4935.

12. On or about August 28, 2024, the CI contacted law enforcement and stated that MINTER contacted him/her from telephone number (304) 415-6723[1]. At law enforcement's direction, the CI called MINTER and asked if s/he could purchase $500 worth of fentanyl and pay an additional $500 on his/her debt. CI stated that MINTER said, "bet, I got you just call me, I got gas." This is street slang meaning MINTER would be fine with that arrangement and he has potent fentanyl. The CI arranged the transaction to take place on August 29, 2024.

13. On August 29, 2024, law enforcement picked up the CI at a predetermined location. Law enforcement searched the CI for any currency/contraband with negative results. The CI then placed a recorded call to MINTER and MINTER told him/her to come to his residence. Law enforcement provided the CI $1,000.00 of prerecorded U.S. Currency along with an electronic recording device. Law enforcement began aerial surveillance on 1106 Rosalie Drive, Charleston, Kanawha County, West Virginia, and the CI was also monitored through the electronic recording device that was provided to him/her. The CI traveled to meet MINTER at his residence.

---

[1] (304) 415-6723 is the number associated with the SUBJECT DEVICE.

Surveillance observed the CI pull up in front of the residence and a silver Dodge Durango pull in front of the CI. MINTER emerged from the Durango and walked toward the CI. MINTER then raised his finger to the CI as if he was telling him/her to wait a minute and walked to the front door of 1106 Rosalie. MINTER then used keys to open the front door and walked inside. After a few minutes, MINTER emerged from the residence and walked back to the silver Durango. A female emerged from the silver Durango and MINTER did as well. MINTER then approached the CI and began speaking with him/her. After a brief conversation, he retrieved the prerecorded currency from the CI and then walked back inside the residence with the prerecorded currency. MINTER returned to the CI a short time later. MINTER then handed him/her a black rubber glove with something inside. The CI then took the black glove and drove back to a predetermined location. The CI provided law enforcement the black rubber glove. Inside the glove was a clear plastic bag containing a pink substance, suspected to be fentanyl. The CI stated that this is how MINTER commonly packaged fentanyl for distribution. The CI was searched by law enforcement with negative results. The suspected fentanyl weighed approximately 28.9 grams in its original packaging and field tested positive for the presence of fentanyl and heroin.

14. On or about September 3, 2024, investigators picked up the CI at a predetermined location. At law enforcement's direction, the CI had previously spoken with MINTER and arranged another purchase for one ounce of fentanyl. The ounce of fentanyl would cost $1,000. Law enforcement searched the CI for any currency/contraband. Law enforcement discovered a few dollars that the CI had in his/her possession and held onto the currency for the remainder of the controlled buy. The CI then called MINTER several times but did not receive an answer. A few minutes later, MINTER called the CI back and stated that he would meet the CI near Clendenin

Street in Charleston, Kanawha County, West Virginia. Due to MINTER unexpectedly calling back, law enforcement was unable to record the call.

15. Law enforcement gave the CI $1,000 in prerecorded U.S. Currency along with an electronic recording device. The CI then drove to Clendenin Street and parked between the mall and the civic center. While enroute, the CI called MINTER and MINTER gave him/her direction on how to get to the meeting location. Law enforcement began aerial surveillance, and the CI was also monitored through the electronic recording device that was provided to him/her. MINTER was observed walking toward the CI pushing a lawn mower from the area of the civic center. MINTER then approached the CI vehicle on the driver's side. MINTER then began to speak with the CI and quickly dropped a black rubber glove inside the vehicle. The CI then handed MINTER the $1,000 in prerecorded currency in exchange for the contents of the black rubber glove. After a brief conversation, MINTER walked back towards the Civic Center and the CI drove towards the predetermined location. The CI provided the black rubber glove that contained a clear plastic bag containing a pink substance that appeared to be suspected fentanyl. The CI stated that s/he received this in exchange for the prerecorded currency. The CI was searched by law enforcement with negative results. The suspected fentanyl weighed approximately 29.1 grams in its original packaging and field tested positive for the presence of fentanyl.

16. On September 5, 2024, law enforcement met the CI at a predetermined location. Law enforcement previously spoke with the CI and directed him/her to set up another deal with MINTER. The CI stated that MINTER was awaiting his/her arrival and the deal was $1,000 for an ounce of fentanyl. Law enforcement searched the CI for any currency or contraband with negative results. Law enforcement provided the CI $1,000 in prerecorded U.S. Currency along with an

electronic recording device. Law enforcement began aerial surveillance on 1106 Rosalie Drive, Charleston, Kanawha County, West Virginia, and the CI was also monitored through the electronic recording device that was provided to him/her. The CI then called MINTER when s/he was parked out front of his residence. A short time later, MINTER exited 1106 Rosalie Drive and walked up to the driver's side of the CI's vehicle. MINTER reached his hand inside the vehicle and retrieved the prerecorded currency from the CI. After a brief conversation, MINTER handed the CI a black rubber glove and told him/her "that's 26" referring to the weight of the fentanyl. The CI and MINTER continued conversing for a few minutes before departing. The CI drove back to the predetermined location and MINTER went back inside 1106 Rosalie Drive.

17. The CI met with law enforcement and provided the black rubber glove containing a clear plastic bag. Inside the clear plastic bag was a pink substance, suspected to be fentanyl. The CI stated that this is what s/he received in exchange for the $1,000 in prerecorded currency. The CI was searched a second time by law enforcement with negative results. The suspected fentanyl weighed approximately 26.9 grams in its original packaging and field tested positive for the presence of fentanyl.

18. On September 10, 2024, law enforcement executed a search warrant issued by a Kanawha County, West Virginia Magistrate for 1106 Rosalie Drive Charleston, Kanawha County, West Virginia. Law enforcement located MINTER at the residence and recovered U.S. currency and the SUBJECT DEVICE from MINTER's person. During the search of the residence, and the following items were located: a large bag of suspected marijuana; multiple bags of suspected methamphetamine; a green Android phone; suspected fentanyl gray in color; brown paper bag containing multiple bags of suspected fentanyl; a Taurus 9mm G3 loaded magazine with one in

the chamber; a S&W M&P .40 loaded magazine with one in the chamber; a loaded extended magazine 9mm; and suspected fentanyl wrapped inside black rubber gloves.

19. During processing the evidence seized, law enforcement called (304) 415-6723 which is the number the CI had been calling to set up the controlled buys with MINTER. The SUBJECT DEVICE began ringing that was found on MINTER's person.

20. Inside the brown paper bag, law enforcement found multiple plastic bags containing a white powdery substance suspected to be fentanyl, a large plastic bag containing a pink substance that was suspected to be fentanyl, and a clear plastic bag containing a gray powdery substance suspected to be fentanyl. The total weight of the substances inside the brown paper bag including packaging was approximately 187 grams. The pink substance was field tested positive for the presence of fentanyl. The two black gloves contained large pink chunks of suspected fentanyl which weighed approximately 370.6 grams in the original packaging. The suspected methamphetamine weighed approximately 312.7 grams in the original packaging and one bag field tested positive for the presence of methamphetamine.

21. Based on my training, experience, and the investigation thus far, probable cause exists that the SUBJECT DEVICE contains evidence of drug trafficking by MINTER, others known, and others yet unknown. Specifically, evidence of drug-related communications by MINTER, along with photographs or other information more fully described in Attachment B, is currently located within the electronic memory of the SUBJECT DEVICE.

## TECHNICAL TERMS

22. Based on my training, experience, and conversations with other experienced narcotics investigators, I use the following technical terms to convey the following meanings:

   a. Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

23. The SUBJECT DEVICE is a cellular telephone. In my training and experience, examining data stored on cellular telephones can uncover the relevant evidence described above as well as evidence identifying who used or possessed the device.

24. The SUBJECT DEVICE is an Apple product. In my training and experience, examining data stored on these kinds of devices can uncover the relevant cellular telephone evidence described above as well as evidence identifying who used or possessed the devices.

Often, such devices have different security protocols such that they may not all be locked, or one device may be more easily accessed by the examiner. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. The information would include but not be limited to text messages, multimedia messaging service (MMS) messages, and encrypted messages to and from coconspirators over various applications like SnapChat, Instagram, and Facebook. Phone logs, usernames, GPS locations, images are also stored on electronic devices. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

26. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence is stored within the memory of the SUBJECT DEVICE because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the

SUBJECT DEVICE. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether electronically stored information is evidence may depend on other information stored on the device and the application of knowledge about how electronically stored data works. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the applied-for warrant would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is probable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the information described in Attachment B.

Respectfully submitted,

Jennifer L. King
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me by telephone pursuant to Fed. R. Crim. P. 41(d)(3)

On Sept. 19, 2024:

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE